## 66762. ATLANTIC STATES CONSTRUCTION, INC. v. BEAVERS.

BIRDSONG, Judge.

This is a case of first impression involving interpretation of the dissenting shareholders provisions (OCGA §§ 14-2-250, 14-2-251 (Code Ann. §§ 22-1201, 22-1202)) of the Georgia Business Corporation Code. (OCGA § 14-2-1 et seq. (Code Ann. § 22-101 et seq.))

This appeal, which was filed in the Supreme Court but transferred to this court, is brought by Atlantic States Construction, Inc., from the trial court's order awarding dissenting shareholder Beavers $349,420 as the fair value of his stock in McDonough Construction Company ("McDonough") and UG Construction Company ("UG"). The judgment also awarded $51,635.42 as attorney fees and expenses, $17,973.76 as expert fees and expenses, and interest at the rate of 14.5%. Appellant Atlantic is the surviving corporation of a merger, from which appellee dissented, between McDonough and UG into appellant. At the time of the merger, March 31, 1981, appellee owned 70,000 shares of McDonough common stock and 1,000 shares of UG common stock, or 10% of the total stock of each company. The stocks were not publicly held or exchanged on the open market, and appellee was the only minority shareholder. Both companies were primarily involved in the general construction business.

After appellee's dissent from the merger and his refusal of appellant's offer of $3.57 per share for Beavers' McDonough stock and $31.14 per share for his UG stock, appellant instituted this action pursuant to OCGA § 14-2-251 (g) (1) (Code Ann. § 22-1202). The parties stipulated compliance with all procedural requirements of OCGA §§ 14-2-214 (Code Ann. § 22-1005), 14-2-250 (Code Ann. § 22-1201), and 14-2-251 (Code Ann. § 22-1202). The trial judge, sitting without a jury, received a voluminous amount of evidence, including expert testimony, concerning the value of the stock in question. In a lengthy order, the trial judge delineated the numerous facts, including the factors, and relative weights assigned to each, used in arriving at the assigned values. The court's per share valuation was independent of and varied from Beavers' demand and Atlantic's pre-litigation offer, the book value of the shares, and the valuations of appellee's and appellant's "experts."

## PER SHARE VALUATIONS

|  | Court's | Beaver's Expert and Beaver's Demand | Atlantic's Pre-Trial Offer | Book Value | Atlantic's Expert |
|---|---|---|---|---|---|
| McDonough | 4.83 | 7.31 | 3.57 | 3.45 | 3.23 |
| UG | 11.32 | 42.39 | 31.14 | 18.86 | 15.93 |

Appellant contends on appeal that the judgment of the trial court was erroneous in the following respects: (1) the judgment is without supportive evidence; (2) the court inappropriately applied the burden of proof; (3) the court rejected evidence of historical sales and industry norms; (4) the court's valuation methodology was without foundation; (5) the methodology was arbitrary; (6) certain factors and their weights contradict the evidence; (7) the judgment contains a mathematical error; (8) the court failed to apply "minority" or "lack of marketability" discount factors; (9) the award of 14.5% interest was improper; and (10) the award of attorney and expert witness fees was improper, in view of the limited (24.7%) discrepancy between the pre-litigation offer and the final judgment (see Multitex Corp. v. Dickinson, 683 F2d 1325 (11th Cir., 1982), wherein an award of attorney fees was not issued despite an offer-judgment discrepancy of over 200%). Since no Georgia appellate court has previously dealt with the provisions of OCGA § 14-2-251 (g) (Code Ann. § 22-1202), we will first discuss several general principles governing valuation of dissenting shareholders' stock pursuant to this statutory scheme; we will then test appellant's contentions against those legal principles and the facts of this case. *Held:*

1. " 'It is, of course, fundamental that legislative intent is the determining factor in judicial construction of ambiguous legislative enactments. . . . In arriving at this intent of the legislature, it is also fundamental that all of the words of the statute are to be given due weight and meaning . . . and that the court is not authorized to disregard any of the words of the statute in question unless the failure to do so would lead to an absurdity manifestly not intended by the legislature.' [Cit.] 'It is a well-established principle that a statute must be viewed so as to make all its parts harmonize and to give a sensible and intelligent effect to each part. It is not presumed that the legislature intended that any part would be without meaning.' [Cit.]" *Nockonwood Indus. v. Tuloka Affiliates,* 164 Ga. App. 424, 425 (296 SE2d 405).

2. Although no prior Georgia decisions have been rendered on the subject, the Eleventh Circuit Court of Appeals recently

considered OCGA § 14-2-251 (g) (Code Ann. § 22-1202) in the context of several issues raised by the present case. Multitex Corp. v. Dickinson, supra. In that case it was noted that the Georgia dissenting shareholder provisions were adopted in 1968 (1968 Ga. L., p. 565) from § 623 of the New York Business Corporation Law. See Comment to OCGA § 14-2-251 (Code Ann. § 22-1202). Accordingly, when appropriate, we will look to New York decisions construing the parent provisions as an aid in interpreting the Georgia statute. See *Seaboard Air-Line R. Co. v. Fountain,* 173 Ga. 593, 599 (160 SE 789).

3. The general purpose behind the statutory scheme for appraisal of dissenting shareholders' stock is to provide an orderly and fair method to evaluate the ownership interests of shareholders who are forced from the corporation by their dissent from certain corporate action. OCGA § 14-2-251 (Code Ann. § 22-1202); see generally 19 AmJur2d, Corporations § 511. The statute provides only that dissenting shareholders are to be compensated for "the fair value [of their shares] as of the close of business on the day prior to the shareholders' authorization date [the date of the shareholders' vote authorizing the proposed corporate action (OCGA § 14-2-251 (b) (Code Ann. § 22-1202))], excluding any appreciation or depreciation directly or indirectly induced by such corporate action or its proposal." OCGA § 14-2-251 (g)(4) (Code Ann. § 22-1202). No mandatory formula or methodology is enumerated. The apparent intent behind use of the amorphous term "fair value" is to allow for considerable flexibility in the trial court's valuation, "because of the [potential] existence of a state of facts peculiar to the situation involved in the particular case." In Matter of Endicott Johnson Corp. v. Bade, 37 NY2d 585, 588 (376 NYS2d 103, 338 NE2d 614). Any attempt by the appellate courts to establish a set of factors, or a methodology, that the trial courts must use in every determination of "fair value" would defeat the purpose for which the legislature provided the flexible standard. The only requirements we read into the statute in this regard are that the trial courts consider all factors relevant to the determination of the per share "fair value" in each particular case and apply a reasonable methodology supported by the evidence. Id.; see generally Annot., 48 ALR3d 430, § 3 [b].

4. We reject, however, strict adherence to the "willing seller, willing buyer" nomenclature enumerated in Multitex, supra, p. 1329. This terminology has traditionally been used in this state to define "market value." *Central Ga. Power Co. v. Stone,* 139 Ga. 416, 419 (77 SE 565). However, as the trial court noted in its order in this case, all relevant factors should be considered in determining "fair value," including market, earnings or investment, and asset value. See Multitex, supra, p. 1329; Annot., 48 ALR3d 430; In Re Kaufmann,

Alsberg & Co., 15 App. Div. 2d 468 (222 NYS2d 305). While the observation contained in Multitex, supra, pp. 1329-1340, may be correct that the "willing seller/willing buyer" test necessarily accounts for factors other than pure market value, and while a hypothetical "willing seller/willing buyer" model may be the best approach to valuation in many cases, we believe that confusion will best be avoided by refraining from the use of the "willing seller/willing buyer" test to define "fair value" and limiting its use to define "market value," a factor that clearly will be relevant in the determination of "fair value" in many cases. The "fair value" of stock is merely its intrinsic worth after consideration of all relevant factors. See Lucas v. Pembroke Water Co., 205 Va. 84 (135 SE2d 147).

5. We agree with the holding in Multitex, supra, (3), that the initial burden of proof of "fair value" rests with the corporation. OCGA § 14-2-251 (f) (Code Ann. § 22-1202) requires the corporation to make an initial offer for the shares. OCGA § 14-2-251 (g)(1) (Code Ann. § 22-1202) then forces the corporation to institute the appraisal proceedings in superior court if the offer is rejected. After initiation, the corporation should not be permitted to sit back while the shareholder is forced to develop evidence establishing some initial value for the shares.

6. We will now turn to appellant's specific attacks on the judgment of the trial court. The court found that the following factors should be reviewed "in evaluating a stock not traded and without a market . . .: (a) Earnings history (b) Investment value of the company (c) Nature of the business (d) Regional position in the market (e) Management (f) Reputation of the business and goodwill (g) Size and regularity of dividend (h) Economy (i) Prospects for company in the immediate future (j) Book value of the stock." See 26 CFR §§ 20.2031-2. The court then gave each factor a positive or negative weight, added up the weighted factors, and, for McDonough, multiplied that total by the per share book value. For UG, the court multiplied the total weighted factors by book value, then added the resulting figure to book value. The resulting figures represented the "fair value" of each share of stock. Total weighted factors were + 1.4 for McDonough stock and − .4 for UG stock. Thus, the trial court's "fair value" was $4.83 per share (1.4 × $3.45) for McDonough stock and $11.32 per share (− .4 × $18.86 = − 7.54; 18.86 − 7.54 = 11.32) for UG stock. The per share values were then multiplied by the total number of shares previously held by appellee to obtain the total award. The court refused to apply a "minority interest" discount or "lack of marketability" discount to either the total award or the per share values.

(a) Appellant first contends that there was no evidence to

support the judgment, inasmuch as the trial court expressly rejected the opinions of the "entirely partisan" experts for the parties. This contention by appellant is without merit. It is well settled that "[t]he trier of fact is always free to reject expert testimony." *Dabney v. Ammons,* 150 Ga. App. 737, 738 (258 SE2d 551). The court's order demonstrates that it rejected only the experts' conclusions on the ultimate issues of fact, but did not reject all of the evidence upon which those conclusions were based. The record is replete with factual testimony and documentary evidence from which the trial judge could have reached his own, independent evaluation of the stocks, without relying upon the opinions as to value offered by the experts. Nothing in OCGA § 14-2-251 (Code Ann. § 22-1202) supports abrogation of the general rule allowing the trier of fact to reject expert opinions. Appellant's contention that the trial court rejected the only evidence upon which a determination could have been based is without merit.

(b) Appellant next contends that the trial court applied an inappropriate burden of proof. The order expressly belies this contention, as the trial court outlined the same burden noted in Division 5 above. Appellant's contention in this regard appears to be based on the argument that since the trial court rejected the opinion of appellee's expert, who opined that the value of the stock was in excess of its book value, the court had no basis upon which to reject appellant's contention that the stock could not be worth more than book value. However, this expert's opinion was only one piece of a mountain of evidence, some of which supported a valuation for McDonough in excess of book value. Appellant's argument that the trial court rejected the only evidence supporting a valuation in excess of book value is without merit.

(c) Appellant next contends that the trial court erroneously rejected evidence of historical sales and "recognized industry norms." These contentions also have no merit. The court found the historical sales to be irrelevant, and this finding is amply supported by the paucity and ancient nature of those sales. See Division 6 (e) below. As for rejection of "recognized industry norms," appellant refers to the court's refusal to equate book value with fair value. As should be seen from the discussion in Division 3 above, the trial court was not restricted to consideration of book value only, although the evidence in this case mandates that some consideration be given to book value.

(d) Another error perceived by appellant concerning the trial court's determination of fair value arises from the court's conclusion of law stating that public policy prohibits the consideration of a "minority discount" as an independent factor in determining fair

value. Appellant argues that a factor bearing on the fair value of appellee's block of shares is the diminution in the price the shares would bring in the market accruing from the minority or non-controlling nature of appellee's interest in both predecessor corporations, and that failure to account for that discount compensates the shareholder for more than the "value" of the stock in hand. See 26 CFR §§ 20.2031-2. In support of the trial court's conclusion, appellee argues that consideration of an independent "minority discount" factor would, in effect, grant the controlling shareholder a "control premium" and thus compensate the minority shareholder for less than his pro rata share of the total value of the corporation.

We do not agree with the trial court's conclusion that consideration of the minority nature of the dissenting shareholder's interest is against public policy. We have previously stated that the trial court must consider any factor bearing on the stock's intrinsic worth. See Division 3 above. The focus of the valuation process is on the value of the stock held by the dissenting shareholders, not on the value of some specified percentage of the corporate worth. See, e.g., Jones v. Healy, 184 Misc. 923 (55 NYS2d 349, 356-357). If in a given case the minority nature of the interest diminishes the worth of the stock itself, there is nothing we can find in the statutory appraisal scheme that would prevent the trial court from considering the "minority interest" factor and devaluing the stock accordingly. Presumably, a dissenting shareholder took any relevant "minority interest" factor into account when he purchased the stock. Failure to account for that factor in the appraisal process would unfairly compensate the shareholder for "value" not properly attributable to his shares of stock.

We emphasize, however, that the trier of fact must apply any "minority interest" factor with caution. In many cases, other factors, such as market value, may wholly or partially account for any relevant "minority discount." For example, the per share market value of stock actively traded on an open stock exchange presumably takes into account any "minority discount." Courts must take care not to overemphasize the "minority discount" by further discounting a valuation that already accounts for any diminution in the value of the stock accruing from the shareholder's minority interest in the corporation. Courts must also take care to consider a "minority interest" factor only when relevant to the fair value of the stock under consideration. This is a determination that must be made by the trial court under the evidence presented.

(e) We adopt a similar approach to appellant's argument that the trial court should have factored the "lack of marketability" of the

subject stock into the "fair value" determination. There may be some instances wherein a stock's worth is diminished by the illiquid nature of the asset created by the lack of a market for the stock. In such instances, the marketability of the stock would be an additional factor that should be considered in determining fair value. However, as with the "minority interest factor," courts must guard against overemphasizing the lack of a ready market or mechanism for selling a particular stock. The "lack of marketability" may be relatively insignificant to investors or potential investors in many corporations. Again, it is for the trial court to determine from the evidence whether marketability has any bearing on a stock's fair value.

(f) We do not agree with appellant's contention that the factors considered by the trial court are without evidentiary support; to the contrary, the factors are amply supported by the evidence. "Findings of fact made by a trial court in non-jury cases are given the same weight as a verdict in jury cases, and will not be set aside on appeal unless they are shown to be clearly erroneous or wholly unsupported by the evidence." *Hanna Creative Enterprises v. Alterman Foods,* 156 Ga. App. 376-377 (274 SE2d 761); OCGA § 9-11-52 (Code Ann. § 81A-152).

(g) However, we agree that the methodology, or valuation formula, applied by the trial court is erroneous as a matter of law in that it is arbitrary, unsupported by the evidence, and incapable of rendering consistent, logical, and predictable results. As can be seen from the formulas outlined above, in the final stage the court actually was forced to apply a different methodology to UG than was applied to McDonough in order to obtain a value sensible on its face, although the same formula was purportedly applied to both stocks. An example will illustrate the unreasonableness of the trial court's methodology. Application of the "McDonough formula" (which is the only formula specified in the order) to UG would result in a negative $7.54 value ( − .4 × 18.86), which obviously is a wholly unsupportable result. Application of the variant "UG formula" to McDonough would result in a positive $8.28 value (1.4 × 3.45 = 4.83; 4.83 + 3.45 = 8.28), an equally unsupportable result under the evidence. Thus, the methodology employed by the trial court is wholly unreliable. While the trial court has considerable latitude in determining an appropriate formula, that formula cannot be arbitrary or unreasonable. See Division 3 above. The methodology employed inconsistently by the trial court to both stocks is arbitrary and clearly erroneous. "Thus, it is irrelevant whether the judgment in favor of [Beavers] fell within the range of evidence presented, 'because we cannot say what the trial judge would have concluded if he had been [utilizing a legally proper methodology].' [Cit.]"

*Marathon Oil Co. v. Hollis,* 167 Ga. App. 48 (2) (305 SE2d 864).

(h) We will not specify a methodology that must be applied by the trial court on remand. As can be seen from Division 3 above, that court must determine the proper methodology based upon the evidence and any formula not "clearly erroneous" will be unassailable on appeal. OCGA § 9-11-52 (Code Ann. § 81A-152).

7. OCGA § 14-2-251 (g) (6) (Code Ann. § 22-1202) provides that the "final order *shall* include an allowance for interest, *at such rate as the court finds to be equitable, from the shareholders' authorization date to the date of payment*" (emphasis supplied) unless the shareholders' refusal to accept the prelitigation offer was in bad faith. Thus, absent a finding of bad faith on the part of the shareholder, the trial court must award interest, and the "equitable" rate of interest, designed to compensate the shareholder for the non-use of his investment during the pendency of the appraisal, is a matter of fact that must be determined from the evidence in each case. The trial court's finding in this regard may not be overturned on appeal unless "clearly erroneous," i.e., without any supportive evidence. OCGA § 9-11-52 (Code Ann. § 81A-152). We find no support for appellant's contention that the "equitable" rate must equal the legal rates of interest (OCGA §§ 7-4-2 (Code Ann. § 57-101), 7-4-12 (Code Ann. § 57-108)) in every case. We agree, however, that the legal rates are prima facie "equitable," and any award deviating from the legal rates must be based upon sufficient evidence demonstrating that another rate is appropriate.

Due to the fact that we are reversing the trial court's valuation and the fact that the relevant time period for calculation of the "equitable" rate of interest runs from the authorization date to the date of payment, the trial court will have to receive additional evidence in order to determine whether interest should be awarded and the proper rate of interest pursuant to OCGA § 14-2-251 (g) (6) (Code Ann. § 22-1202). Thus, we need not consider whether the previous award and rate of 14.5% is proper. However, we will emphasize that the trial court must determine a rate that is "equitable" to both parties over the entire relevant time period (authorization date to payment date), not a rate that would have been "equitable" only on the authorization date. Thus, any relevant evidence — such as evidence regarding the rate of return for similar investments and alternative investments utilized by the dissenting shareholder during the time period in question, the projected rate of return on the dissenting shareholder's stock during the time period in question, and the rate at which the corporation borrowed money during the time period in question — should be considered, but an award of interest at a rate other than the legal rate must be based

upon evidence sufficient to establish an "equitable" rate for the entire relevant time period. The "equitable" rate should provide neither a "bonanza" for the dissenting shareholder nor an incentive for the corporation to lengthen the appraisal process.

We also note, as both parties in part concede, that an award of interest under OCGA § 14-2-251 (g) (6) (Code Ann. § 22-1202) accrues only on the portion of the judgment representing the fair value of the dissenting shareholder's stock.

8. Our holdings in Division 6 (d), (e), and (g) above necessitate reversal and remand of the case to the trial court for a re-determination of the fair value of the stocks in question, a rehearing on and redetermination of the issues concerning interest, and a redetermination of the propriety of awarding attorney fees and expert witness expenses. The propriety of the award of such fees and expenses in the judgment under review is rendered moot by the reversal of the trial court's valuation, as are the issues regarding the alleged mathematical error in that judgment and interest. After a redetermination of the fair values and disposition of the interest issues, the trial court should conduct another review pursuant to OCGA § 14-2-251 (g) (7) (Code Ann. § 22-1202) as to attorney fees and expert witness expenses.

*Judgment reversed and case remanded for further proceedings consistent with this opinion. Shulman, P. J., concurs. McMurray, C. J., concurs in the judgment only.*

DECIDED JANUARY 31, 1984.

*Earle B. May, Jr., Jeffrey S. Muir,* for appellant.
*Ralph B. Levy, Robert Thornton,* for appellee.
*Thomas S. Richey, Walter G. Moeling IV,* amici curiae.